MONTANA-DAKOTA UTILITIES CO., a Corporation, Plain-
tiff and Respondent, v. MONTANA GAS CORPORATION,
a Corporation, Defendant and Appellant.

No. 9315.

Submitted February 19, 1957. Decided May 2. 1957.

Rehearing Denied July 3, 1957.

312 Pac. (2d) 521.

Messrs. Smith & Smith, Great Falls, for appellant.

Mr. Earl H. A. Isensee and Mr. Armin M. Johnson, Minneapolis, Minn., Messrs. Kuhr & Weber, Havre, for respondent.

Mr. LaRue Smith, Jr., and Mr. Johnson argued orally.

MR. JUSTICE ANGSTMAN:

This action involves the question of the proper interpretation of contracts for the sale and purchase of natural gas distributed at Havre, Chinook and Harlem.

Plaintiff buys the gas from defendant and distributes it to its customers in the above-named cities. The main gas supply comes from what is known as the Bowes Gas Field south of Chinook.

Defendant owns and operates a natural gas pipe line system extending northerly and westerly from the Bowes Field for about 3.5 miles, thence one line extends northeasterly for about 5.3 miles to the town border station at Chinook and another in a westerly direction about 18.8 miles to the town border station at Havre. The line extending westerly to Havre runs through what is known as the Box Elder Field, and a part of

the gas delivered to Havre by defendant or its predecessors since 1932 has been taken from the Box Elder Field.

Since 1943 plaintiff has sold and distributed gas to Harlem which was produced in the Bowes Field, and purchased from defendant and transported in plaintiff's pipe line, a distance of 25.6 miles.

Several contracts must be examined to ascertain the intention of the parties.

The amendment made on September 17, 1943, to the previous contracts is the one that precipitated this controversy. Among other provisions the amendment of September 17, 1943, contains this provision:

"So long as seller can meet buyer's demand buyer will purchase from seller all gas required by buyer for distribution in the Cities of Havre and Chinook and within a radius of five (5) miles of each of said cities but if, at any time, seller's gas supply shall become depleted so that seller cannot furnish to buyer its requirements for sale and distribution in said Cities, then and thereafter the rate to be paid by buyer for natural gas furnished by the seller hereunder shall be the rate per thousand cubic feet which was paid for the year preceding such depletion; provided that if, at any time thereafter, the seller shall make available to the buyer at the Cities of Havre and Chinook sufficient gas to meet buyer's demands and distribution in said Cities, the rates hereinabove provided shall again become applicable unless buyer shall, in the meantime, have secured another source of supply, in which last mentioned event the rate shall continue to be the rate paid by the buyer to seller for the year preceding such depletion, irrespective of the amount of gas which the seller may have available for delivery to the buyer. In the event seller's gas supply becomes depleted and seller can no longer furnish buyer's maximum daily requirements and buyer secures another source of supply, buyer shall thereafter purchase from seller fifty per cent (50%) of buyer's annual requirements for Havre, Chinook and buyer's Harlem Pipe Line so long as seller has gas available to furnish that amount.''

Plaintiff alleged in its complaint that defendant on May 18, 1950, notified it in writing that defendant could no longer supply plaintiff's requirements and that it should seek a new supply. This plaintiff did by constructing a pipe line to Havre which was 69 miles long extending from what is known as the Utopia Structure situated west and north of Havre.

Plaintiff also alleged in its complaint that under the amendment to the contracts made on September 17, 1943, defendant is now obligated to supply the total annual gas requirements for Harlem so long as it is able to do so from the Bowes Field and to supply all of the gas requirements of Chinook so long as defendant has gas reserves available to meet such requirements, and to supply as much of the Havre requirements as it is capable of supplying, providing that plaintiff is required to purchase from it as a minimum 50 per cent of the aggregate annual requirements for the three cities. This allegation fairly summarizes plaintiff's contention, and this is the relief sought by plaintiff in this action.

Defendant contends that when all the contracts are read together, along with the amendment of September 17, 1943, it discharged its obligation by delivering to plaintiff 50 per cent of the requirements for each of the three cities separately considered.

The complaint alleges that during the year of 1952 defendant provided all of plaintiff's requirements for Harlem and Chinook and about 35 per cent of the Havre requirements, but threatens to cut off its supply to Harlem and Chinook after it has supplied 50 per cent of the requirements for each of those cities; that if defendant's threat is carried out plaintiff will be obliged to construct a new pipe line from Havre to Chinook and Harlem, which is unnecessary, uneconomic and contrary to the public interest and contrary to the intent of the parties as expressed in the contract; that the rate paid in Havre and Chinook for the preceding year was 13.75 cents per thousand cubic feet. Defendant admits this allegation but alleges that the Public Service Commission of Montana in January, 1952, raised the

rates in Havre and Chinook more than 10 cents per thousand cubic feet, which entitled defendant to a reciprocal raise as provided in the amendment of September 17, 1943, but not exceeding the January 1, 1938, rate which was 16 cents per thousand cubic feet.

Both parties agree that the rate for Havre and Chinook should be the same, but they disagree on what the rate should be Plaintiff contends it should be 13.75 cents per thousand cubic feet and defendant asserts it should be 16 cents.

The court found that defendant must deliver to plaintiff, so long as its reserves in the Bowes Field are sufficient, all of its requirements for distribution at Harlem at a cost of 5 cents per thousand cubic feet except when furnished through compression and then the rate shall be 6 cents per thousand cubic feet.

As to the City of Chinook, the court found that defendant must deliver to plaintiff sufficient gas to supply all of its needs there so long as there are sufficient reserves in the Bowes Field for that purpose.

As to Havre the court found defendant must supply as much as it is capable of supplying and as plaintiff is willing to buy, provided that plaintiff must purchase as a minimum 50 per cent of plaintiff's aggregate annual requirements for the three cities.

The court fixed the price of the Chinook gas at 16 cents per thousand cubic feet and the Havre gas at 13.75 cents per thousand cubic feet. Defendant appealed from the judgment.

One of defendant's contentions is that the contract provision above quoted which calls for a curtailment of the gas required to be furnished by defendant to 50 per cent never became operative because it contends there was no showing that the gas supply became depleted so that seller could no longer furnish the buyer's maximum daily requirements, and at all events plaintiff did not secure another source of supply within the meaning of that provision of the contract.

The record shows that defendant sent a letter to plaintiff dated

May 18, 1950, reading as follows: "We have failed to furnish your maximum daily requirements in several instances during the last two winters. We believe we will not be able to meet your maximum daily requirements next winter unless your maximum daily requirement is considerably below your maximum daily requirement of the last two winters or unless we expand our pressure and pipe line facilities and/or find an additional supply of gas. So far as our contract is concerned, we feel that under these circumstances you should feel free to construct a pipe line under the terms of our present contract, which entitled you to serve fifty per cent of the market."

This letter was ample to show that the conditions were met justifying resort to the clause of the contract restricting defendant's obligation to supply only 50 per cent of the requirements of plaintiff and obligating plaintiff to purchase only 50 per cent of its requirements from defendant. That defendant so understood the letter is made plain by the last sentence in the letter.

Furthermore, the evidence shows that the Buttrey Store, the courthouse, and the Federal Building in Havre converted to coal on account of the gas shortage in the winter of 1948, 1949. Likewise, Northern Montana College could not get gas. In fact in 1950 the Public Service Commission established rules for curtailing service in all three communities of Havre, Chinook and Harlem. That order first curtailed industrial users, then large commercial users such as schools and courthouses and was effective until plaintiff completed its new supply line in 1951.

The contract itself in legal effect defined the expression, "seller's gas supply shall become depleted" by stating, "so that seller cannot furnish to buyer its requirements for sale and distribution in said cities."

As to the contention that plaintiff has not secured another source of supply little need be said. Specifically, it is contended by defendant that there is no source of supply unless the supply is adequate, and a line is constructed so as to serve all of the three cities. We rule otherwise. When facilities were in-

stalled to obtain gas from the Utopia Field to furnish gas to some of its customers, plaintiff had secured another source of supply within the meaning of the contract.

The question then remains as to the meaning of the above-quoted portion of the contract when we apply the 50 per cent restriction. To arrive at the intention of the parties in the amendment of September 17, 1943, both parties think it is helpful to consider the terms of the prior contracts.

Exhibit A was a contract dated October 15, 1926, between the predecessors of plaintiff and defendant for the purchase and sale of natural gas in sufficient quantity to supply the needs of the buyer in the City of Havre and within a radius of 5 miles to be served from the Bowes Field and delivered at the city limits of Havre into the system of the buyer. The buyer agreed to pay for a minimum of 100,000 cubic feet per day, and to purchase all the gas required by it from the seller so long as the seller can meet the buyer's demands. It set up a rate schedule ranging from 22.5 cents per thousand cubic feet if the average per day is less than 750,000 cubic feet to 16 cents per thousand when the average is more than 2 million cubic feet per day.

Exhibit B was a contract dated October 22, 1926, between the predecessors of plaintiff and defendant for the purchase and sale of natural gas in sufficient quantity to supply the needs of the buyer in Chinook and within a radius of 5 miles to be served from the Bowes Field. It was practically identical with the Havre contract, except that the guaranteed minimum was fixed at 50,000 cubic feet per day, and it fixed a flat rate of 20 cents per thousand cubic feet for all gas purchased.

Exhibit C was a contract dated March 8, 1930, amending both Exhibits A and B so far as they deal with the selling price of the gas. The effect of the amendments was to combine the deliveries in Havre and Chinook so that the selling price would be computed on the average daily sales in both cities combined. The rate ranged from 22.5 cents per thousand cubic feet when the average daily sales were less than 750,000 cubic feet to 16 cents per thousand cubic feet when over 2 million cubic feet.

Exhibit D was a contract dated November 1, 1930, which provided in substance that plaintiff's customers outside the corporate limits of Havre and Chinook should be served with gas by making connection direct with the seller's pipe line, and the gas so served should be added to that served in Havre and Chinook in determining the rate.

Exhibit E does not affect any question involved here.

Exhibit F is an agreement dated January 1, 1940, reciting that plaintiff had reduced its rate to Havre and Chinook customers and fixed a corresponding reduction in rates to be paid by plaintiff to defendant. This was in pursuance of a formula theretofore agreed upon by an agreement dated January 15, 1938.

Exhibit G is the contract of September 17, 1943, which expressly merges the prior agreements into one contract.

The contract as merged contained a new provision relating to Harlem which reads: ''Seller agrees to sell to buyer, and buyer agrees to buy from seller, as long as seller is able to supply gas to buyer in conformity to the terms of this agreement, natural gas in sufficient quantities to supply buyer with all the needs of buyer for the sale and distribution of natural gas in the City of Harlem, Montana, and within a radius of five (5) miles of such city and along or within the vicinity of buyer's pipe line to Harlem, such gas to be furnished by seller from wells now or hereafter to be drilled upon lands that are now and may hereafter, during the term hereof, be occupied and controlled by seller or any person, firm, or corporation in contractual relation with seller for the production of gas from the present developed geological structure known as the Bowes Structure, in Blaine County, Montana, such gas shall be delivered to buyer's pipe line at some point in Section Nine (9), Township Thirty-one (31) North, Range Nineteen (19) East M.M., or on discharge of seller's compressor station, Blaine County, Montana, convenient to both parties, and the connection shall be made at buyer's expense.''

On and prior to September 17, 1943, plaintiff was the owner

of a majority of the capital stock of Independent Natural Gas Company and a gas purchase contract covering the B. H. Miller half section in the Bowes Field on which there was a producing gas well from which plaintiff supplied the gas to Harlem.

The Independent Natural Gas Company has gas rights in both the Bowes and Box Elder Fields. As a part of the agreement of September 17, 1943, plaintiff sold and assigned all its shares of stock in the Independent Natural Gas Company to defendant and thus parted with its own supply of gas for serving the three cities in question.

By the terms of the final agreement of September 17, 1943, and upon the happening of the contingencies therein provided, plaintiff was released of his obligation to take all of its gas supply from defendant and instead became obligated to purchase from defendant, ''fifty per cent of buyer's annual requirements for Havre, Chinook and buyer's Harlem pipe line so long as seller has gas available to furnish that amount.''

Plaintiff contends that the Havre, Chinook, and Harlem market has been treated by the parties as one market in the aggregate. This it contends is shown by Exhibit H, dated January 21, 1932, which was a contract between defendant and Louis B. O'Neill wherein defendant purchased from O'Neill in the Box Elder Field one-third of the gas which it required for supplying Havre and Chinook. This was done even though there was no pipe line extending from the Box Elder Field to Chinook. It contends that this shows that defendant treated the market as one, so that by relieving the load in Havre from the Box Elder Field more gas was available from the Bowes Field for Chinook and Harlem. We agree that the Havre and Chinook market was treated as one but as will be hereafter noted we think, Harlem was treated separately from the other two cities.

Plaintiff also contends that the entire market in the three places was considered as one by the Public Service Commission.

Reasoning from these premises, plaintiff concludes that defendant's obligation to supply all the gas required at all the three points has never been released or modified, and that the

only change wrought by the agreement of September 17, 1943, is plaintiff's obligation to buy, this obligation having been reduced to 50 per cent of the annual requirements.

Defendant takes the position that its obligation under the contracts is merely to make delivery of all the gas at the points named in the contract and that plaintiff fails to recognize the difference between the word ''delivery'' and the word ''purchase.'' It concedes that plaintiff is obliged to purchase only 50 per cent of the gas after the quota provision became operative, if it ever did, but that the provision for delivery of all gas at each market point has not been changed. It contends that when the quota provision became operative it automatically resulted in reducing the amount of gas to be delivered at each point to 50 per cent.

Defendant's view is that if plaintiff ceased to do business in Havre and Chinook its obligation under the contract would then be discharged by delivering 50 per cent of the annual requirements at Harlem only.

It is our view that the court was right in requiring defendant to furnish all the gas needed by plaintiff to serve its Harlem customers. Harlem was first brought into the picture by the contract of September 17, 1943. It obligated defendant to sell and plaintiff to buy from the Bowes Field ''all of the needs of buyer for the sale and distribution of natural gas in the City of Harlem, Montana and within a radius of five (5) miles of such city and along or within the vicinity of buyer's pipe line to Harlem.'' It fixed a price differing from that in Havre and Chinook.

In considering whether the seller could meet the buyer's demand within the meaning of the contract of September 17, 1943, it was only Havre and Chinook that were taken into consideration. It was assumed by the parties that the first obligation of defendant was to furnish 100 per cent of the gas requirements for Harlem. After that was done then is when defendant's ability to meet plaintiff's demand for Havre and Chinook was to be measured and determined and it was at that

time when plaintiff was permitted to obtain a new source of supply. Since the supply at Harlem had to be maintained at 100 per cent at all times in determining whether defendant could supply plaintiff's demands for Havre and Chinook, we think the court was right in holding that it was within the contemplation of the parties that after the 50 per cent clause became operative it was still defendant's obligation to furnish 100 per cent of plaintiff's needs to supply its customers at Harlem.

As noted above the agreement of March 8, 1930, combined the deliveries in Havre and Chinook and fixed the same rate in each place. That plan was carried out in the contract of September 17, 1943. Those two places are considered as one market and Harlem the other.

When the 50 per cent quota clause became operative it was ▮ then defendant's obligation to deliver 100 per cent of the gas requirements for Harlem and to deliver to plaintiff for distribution in Havre and Chinook, sufficient gas so that its purchase in those two places when added to the Harlem gas would aggregate 50 per cent of plaintiff's annual requirements.

As we shall hereafter point out the rate at Havre shall be the same as at Chinook and defendant has no cause to complain if plaintiff asks delivery of 100 per cent of the requirements at Chinook as found by the court in order to avoid the cost of a pipe line from Havre to Chinook, which would have an impact upon the rates to be paid by the customers in Chinook. Any other view would necessitate the raising of the rates to consumers at Chinook in order to compensate or allow a rate of return for the value of the pipe line which is not needed so far as the customers at Chinook are concerned and defendant would not be permitted to share in that increased rate since it is already receiving the maximum under its contract, viz., the rate in effect on January 1, 1938.

So far as the record shows there is an ample supply of gas. ▮ in the Bowes Field to serve both Harlem and Chinook without resort to gas from the Utopia Field. The court was.

right in requiring defendant to supply Chinook with 100 per cent of its requirements and in requiring defendant to supply to Havre only sufficient to make the minimum of 50 per cent of plaintiff's total requirements in the three cities.

The court was in error in fixing a lower rate at Havre from that at Chinook.

The rate at both places should be the same. Both parties so agree. They differ on what the rate should be. Defendant says it should be 16 cents per thousand cubic feet which was the rate in effect January 1, 1948, by virtue of Exhibit C, the contract dated March 8, 1930. Plaintiff says the rate should be 13.75 cents per thousand cubic feet which it asserts was the rate paid for the year preceding the depletion. By the contract of September 17, 1943, the rate schedule fixed by contract of January 1, 1940, was continued in operation where the bottom rate was fixed at 14.52 cents per thousand cubic feet.

The September 17, 1943, contract also contained this paragraph:

"If, at any time during the life of this contract, or extensions thereof, the buyer shall reduce its top bracket rate to consumers in the City of Havre, Montana, seller will reduce its rates to buyer in the same proportionate part of seventy-seven one-hundredths of one cent (77/100 of 1¢) per thousand cubic feet which such top bracket rate reduction to consumers bears to three cents (3¢)."

It also contained the following:

"That if at any time during the life of this contract, or extension thereof, the natural gas rates to consumers in the municipalities of Havre and Chinook are raised by the buyer the foregoing schedules of rates herein set out shall likewise be automatically raised so that seller shall share equally with buyer in the additional gross revenue from such increase which will be the difference between the return on the present consumer rate schedules in Havre and Chinook on the amount of gas sold in each bracket, and the return under the increased consumer rate schedules in Havre and Chinook, provided, how-

ever, that in no event shall the rate schedules set out herein be raised above the schedules in effect under this contract on January 1, 1938.''

After the contract of September 17, 1943, there was a reduction in the consumer rate at Havre of 3 cents per thousand cubic feet and a schedule was set up showing a bottom rate of 13.75 cents per thousand cubic feet.

Thereafter and in January, 1952, the Public Service Commission raised the rates in Havre and Chinook, and it is defendant's contention that this is when the January 1, 1938, rate of 16 cents per thousand cubic feet became effective.

We agree with defendant on this point. The agreement of September 17, 1943, made it plain that if and when plaintiff obtained another source of supply the rate to be paid by plaintiff to defendant shall be the rate paid for the year preceding the depletion. However that same contract contained the above-quoted paragraph with respect to the effect of an increase in the rates during the life of the contract. That paragraph requires an automatic raise to defendant whenever the rate to the consumers is raised.

The increased rate allowed to plaintiff was due to its expense inconstructing a new pipe line from the Utopia Field to Havre and plaintiff contends there is no reason why defendant should share in that increase. However, that increase applied as well to Chinook as to Havre and plaintiff's pipe line does not extend into Chinook. The contract makes no exception but allows defendant the right to share in any increased rate allowed to plaintiff and paid by its consumers subject however to the provision that the rate shall not ''be raised above the schedules in effect under this contract on January 1, 1938.''

The court was right in fixing the Chinook rate at 16 cents per thousand cubic feet but erred in fixing the Havre rate at 13.75 cents per thousand. The Havre rate should also be 16 cents per thousand cubic feet.

Plaintiff made a cross-assignment of error for dismissing its third cause of action.

In that cause of action plaintiff alleged that defendant in violation of the contract has been selling gas to the Northern Ordnance Company and sought an injunction preventing such sales. The contracts originally prohibited sales from gas reserves in the Bowes Field to everyone except the Great Northern Railway Company and the Utah-Idaho Sugar Company without the consent and approval of plaintiff.

The amendment to the contract made in 1943 reads as follows:

"In order to insure to buyer an adequate supply of natural gas for its purposes, the seller agrees that it will not sell to the owner of any distributing system that may be in competition with the distributing system of buyer in either of the cities of Chinook, Harlem or Havre, Montana, but seller reserved the right to sell gas to the Great Northern Railway Company at Havre, and to the Utah-Idaho Sugar Company at Chinook, Montana."

The evidence shows that defendant did not sell gas directly to the Northern Ordnance Company from the Bowes Field but did so indirectly through the Consumers Gas Company. This was contrary to the contract as finally amended. The purpose of the contracts restricting sales by defendant was to leave the field to plaintiff and also to assure plaintiff that none of the gas in the Bowes Field would be furnished to anyone by plaintiff, subject only to the two exceptions named, viz., the Great Northern Railway Company and the Utah-Idaho Sugar Company.

The court erred in dismissing plaintiff's third cause of action.

The cause is remanded with directions to modify the judgment in accordance with the views herein stated as to the issues other than those involved in plaintiff's third cause of action, and as to it the same is ordered reinstated. The court should rule upon the issues involved as to it, either on the evidence now before it or on such further evidence as either party may desire to submit.

Each party will bear its own costs on this appeal.

MR. CHIEF JUSTICE HARRISON, and MR. JUSTICES CASTLES, BOTTOMLY and ADAIR, concur.